Gerald Singleton, OSB No. 210955
gsingleton@singletonschreiber.com
Susan B. Dussault, OSB No. 021125
sdussault@singletonschreiber.com
Stephen J. Hill, OSB No. 240164
shill@singletonschreiber.com
SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Tel.  (619) 771-3473

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

KEVIN ALLARD; VICKI ALLARD;
KEVIN ALLARD, as trustee of the Allard
Family Trust Dated May 8, 2013; VICKI
ALLARD, as trustee of the Allard Family
Trust Dated May 8, 2013; JODY
ANDERSON; GIAMO ANZALONE;
AUDREY LISA AUTRY; GEORGE
NEWTON AUTRY; JACQUELINE
MARIE BAINES; ADAM BARRETT;
FRANCES J. BARRETT; LISA BRUSH;
FREDDY BARRIOS; DANIEL LEE
BENNETT; BILLICK LOGGING INC., an
Oregon corporation; GARY L BILLICK;
JULIE BIRKHOLZ; KURT SCHRUM;
LISA BLUMHAGEN; GEOFFREY
BLUMHAGEN; CHARLES BOECHLER;
ROBERT BOEHM; SHARON L. BOEHM;
ROBERT BOEHM, as trustee of the
BOEHM FAMILY TRUST; SHARON L.
BOEHM, as trustee of the BOEHM
FAMILY TRUST; KIRK BOLTON;
YEVONNA LOKEY; CORTNEY BOONE;
SETH BRADFORD; CEST'LA MORITZ;
MUSHROOMS NORTHWEST LLC, an
Oregon limited liability company;
DANIEL BREDEN; DANIEL ERNEST
BRENNER; INNOVA/RENOVA, INC., an
Oregon corporation; MARY PATRICIA
LIPP; JIMMY ALLEN BROCK;
MELINDA JEAN BROCK; MELINDA
JEAN BROCK, d/b/a PIXELS and PINE;
FRANK BROWNING; CHARLES
CLIFTON BUCHANAN, JR.; CHARLES
CLIFTON BUCHANAN, JR., as Trustee
of the BUCHANAN FAMILY TRUST;

Case No. _____

**COMPLAINT**
**Negligence; Trespass; and**
**Nuisance;**

DEMAND FOR JURY TRIAL on all
Claims So Triable

COMPLAINT - Page 1

JAMES MICAJUH GNEHM
BUCHANAN; SARAH MICAELA
BUCHANAN; SUZANNA MYKELLE
MACLOUD BUCHANAN; DELLA
LORRAINE CANTRELL-MYERS; BRIAN
CASSIDY; CASSANDRA CHAFIN;
CASSANDRA CHAFIN d/b/a MCKENZIE
RIVER SHUTTLE SERVICE; PARIS
CHAFIN; RICHARD CAMPBELL;
SAXON CAMPBELL; JEFFERY LYNN
CHAPEK; LINDA KATHRYN CHAPEK;
LINDA CHMIEL; SHANDI
CHRISTIANSON; CHAUNCEY
CHRISTIANSON; CAISON ECHOLS;
CODY COOPER; JACK COOPER; SHERI
COOPER; KATHERINE CORBAN;
THOMAS MALCOLM GILBERT;
NICOLE CRUMP; JAMES ALLAN
CURTIS; MOIRA RUTH CURTIS;
STEWART GAVIN CURTIS; MADE BY
MINDY SOUP, LLC, an Oregon limited
liability company; SANDRA CUTLER;
GARY CUTLER;  SANDRA CUTLER, as
trustee of the HAROLD E. DEVINE
TRUST; GARY CUTLER, as trustee of the
PARKER FAMILY TRUST;  NORMAN
DAWDY; JENNIFER ROSINI;
HUBERTUS BERT De KLERK; CEDRIC
J.C. De KLERK; CORNELIA DE KLERK;
ISABELLE C.J. DE KLERK; ANNIE
MARGARITA; KARL ANTHONY
STEPHANY; MICHELLE SUZANNE
STEPHANY; HUBERTUS BERT De
KLERK , as trustee of the BERT DE
KLERK REVOCABLE LIVING TRUST;
ANNIE MARGARITA d/b/a ANNIE
MARGARITA STUDIO; BERT'S GUIDE
SERVICE LLC, an Oregon limited
liability company; MCKENZIE RIVER
INN EXCLUSIVE LLC, an Oregon limited
liability company; PATRICK JOHN
DIBALA; NANCY GLORIA WOOD;
MARK JASON WOOD; PATRICK JOHN
DIBALA, as trustee of the DIBALA
WOOD TRUST; NANCY GLORIA WOOD,
as trustee of the DIBALA WOOD TRUST;
CHRISTMAS TREASURES INC., an
Oregon corporation; MARK DICKERSON;
GARY DYE; CASSIE PENDERGAST;
MICHAEL ENGLISH; JUSTIN SMITH;
LEVEL 7 DRYWALL, LLC, an Oregon
limited liability company; KIMBERLY
DIANE ERICKSON; TRAVIS EVELAND;

ANDREA MULLINS; TOMMY
FERGASON; AUSTIN FOLNAGY;
ALEXIS MAY BECKER; LEXTACY, LLC,
an Oregon limited liability company;
MAGYAR PROPERTY MANAGEMENT
& INVESTMENT LLC, an Oregon limited
liability company; CALVIN MOTT;
SHERRI FRANCE; MARK DEWANE
FREDERICK; VIVIAN CIVISH
FREDERICK; DANIEL GARR; JAMIE
GARR; BILLY GARR; DYLAN GARR;
HAILEE SMITH; ILA GARR; ERIK
GIFFEN; ELISHA GOODRICK; JAMES
RETHAFORD; TANIA LEE GUTIERREZ;
JOHN GUTIERREZ; LEILA MAY
GUTIERREZ; RICHARD STEVEN
HARMS; MARCIA IRENE SHEARER;
MELINDA CHRISTINE HAVERTY,
individually and d/b/a ELK CREEK
CABINS; ALEXANDRIA CHAMBERLIN
BLANTON; TROY LEE RETHAFORD;
JEFFREY KING HENINGTON; JANELL
HIBBS; TAMERA RENA HOLT; LONNIE
B. HORNER; LORRIE HORNER;
MICHAEL HORNER; TEDDY
ROTHMER HUFFORD; LUCAS JOHN
HUFFORD; PEGGY EILEEN HUFFORD;
TIMBERLINE LOGGING, INC., an
Oregon corporation; KENDALYNN
HUMMELL; SARITA INCH-CARRINO;
ANDREW M CARRINO; WILLIAM
JELINEK; TAMI KING; LINDSEY
JENKINS; JAMES JOHNSON;
MICHAEL KEVIN JONES; ERIK
ANDREW JOURNEY; DENNIS
MICHAEL KANE; MICHELLE
KEASLING; WILLIAM WHITAKER;
OLIVIA KILPATRICK; TERRANCE
KIMBLE; DANIEL ORION KRUEGER;
ROBERT LAFONT; CHRISTINA
DORENE LEDFORD; WILLIAM LOUIS
LESSEL; ELIZABETH MAY
LIVINGSTON; ALLEN LIVINGSTON;
MUSTANGS AND FAST FORDS, an
Oregon nonprofit Corporation;
CHRISTOPHER MADDEN; ELLEN
KEAS; JENNIFER MARSHALL; JODEY
MARSHALL; HAROLD LEROY
HUNTER; DAEMUN MARSHALL; RAND
MASSINGHAM; PAMILA
MASSINGHAM; JESSICA KLARR, as
successor in interest to DEJA MATAISZ;
DAVID MAYBERRY; ZACHARY VANTA;

COMPLAINT - Page 3

CRETH MAYR; FRANCIS MERCEDES
MAYR; GABRIEL VILLA; REBECCA
LYNN MCCLASKEY; ROYAL
ALEXANDER MCCLASKEY; WAYNE
ALLAN MCCORMICK; AUSTIN
MELBYE; DAVID MELBYE; TINA
MELBYE; DELMARE MONICAL;
CHALENE MUDD; BEATNIKZ LLC, an
Oregon limited liability company; HALIA
MUELLER; HOPE MUELLER; KARL
MUELLER; MICHAEL MYERS; SHANE
NAVARRO; NAVARRO PROPERTIES
LLC, an Oregon limited liability company;
OREGON METAL ROOFING AND
GUTTERS, LLC, an Oregon limited
liability company; KARIN NEGRETE;
ERIC HICKMAN; ASHLEY NORWOOD-
MCCALL; ALVARO OCHOA; ALEXA
OCHOA; EDITH OCHOA; AMBER
MICHELLE OLIVER; KENDALL
SMELTZER; ANDREW OLIVER;
THOMAS MICHAEL OLIVER; ALYSSA
PANICCIA; MICHAEL PANICCIA;
PEGGY J. PANTEL; KIMBERLY
CHEYENNE PAUL; DAVID EUGENE
PAUL; DREW PETERS; TINA
PETERSON-OYERVIDES; ANGELIQUE
CASTRO; CHRIS OYERVIDES; DJ
PETERSON;  PATRICIA RICHARDSON;
SHARON OUAKIL; BRITTANY R.
PETRENY;  WENDY MILLS QUIRK;
DANIEL LEE QUIRK; JOYCE MARIE
MILLS; JOYCE MARIE MILLS, as
Personal Representative of the GARY
HOWARD MILLS ESTATE; LEXIE
ANNE QUIRK; TAYLOR MARIE QUIRK;
WQ BOOKKEEPING LLC, an Oregon
limited liability company; KATHI
MECHELLE REED; KENDELL CHAD
REESE; KAYLA MARIE KUMLE;
WINONA RHODES; KYLE RICHARDS;
GREG DAVIS; KATHRYN HEINONEN;
ANN STATEN; CASEY STATEN;
ROBERT RIEDMANN; ANNA LEIGH
RIEDMANN; PHOENIX RIESING;
MARY RIPPBERGER; MARK A.
ROHLFS, individually and d/b/a SANTA
& SONS CHRISTMAS TREE; PATRICIA
A. ROHLFS; DENISE ROLFE; LARRY
WOODWARD; JIM DOUGLAS CLINTON
ROMAN; LINDSAY MICHELLE
ROYALS; BRANDON MICHAEL SHAW;
CODY RUMBLE, individually and d/b/a

STRINGS PRODUCTION;  JAIME
SALAZAR; DIANA SHEFCHECK,
individual and as Trustee of the STEVEN
AND DIANA SHEFCHECK LIVING
TRUST; STEVEN SHEFCHECK,
individual and as Trustee of the STEVEN
AND DIANA SHEFCHECK LIVING
TRUST; MEGAN MARIE SHELLY; CY
BENEDICT DELLENBACK-
OUELLETTE; JOSIAH SHIRLEY;
RONALD GENE SHORT; REBECCA
EMLAY SHORT; RSC, INC., an Oregon
corporation; ROBERT SHUSTER;
TERESA SIMMONS; CHRISTOPHER
HERNANDEZ; JAMERSON SIMPSON;
LAURA SIRECI; ROBIN ELAINE
SLAVEN; KEONI SOPER; ANDREW E.
SPENCER; ANNA K. COURGAIN;
ZACHARY ST. VINCENT; NATALIA
STOCKTON; GARRETT STEVENS;
STEPHANIE BOBBITT; DOUGLAS
HUERTA; JIMMY JORDAN; JOSH
STONE; SHANTEL WERNER;
MICHAEL EDWARD SULLIVAN;
DACHIA THOMPSON; TRISTAN
THOMPSON; OLIVIA THOMPSON;
ADAM COTTA;  RICHARD THOMPSON;
CHRISTOPHER GOHL; DAVID
THULSTRUP; LUANNE THULSTRUP;
STEVEN TRINE; TIFFANY HARVEY;
KAYLA TROUTMAN; SHAUN KELLY
BORG; BRIAN THOMAS VARNEY;
MELISSA ANN VARNEY; JASON
DUPREE WALKER; JEFFREY
STERLING WELCH; RUSSELL GLENN
WEST; STEWART WESTON; WILLIAM
M. WIESE; JOSHUA ANTHONY
COACH; RIKKI RAQUEL ESTRADA;
JULIE WILCHER; LISA WILLSON;
MORGAN ROSE WILLSON; JANE
WILSON, individually and as trustee of
the BOB AND JANE WILSON FAMILY
TRUST, UAD April 17, 2018; ROBERT
WILSON, individually and as trustee of
the BOB AND JANE WILSON FAMILY
TRUST, UAD April 17, 2018; JANET
WILSON; MICHELLE WILSON; AUSTIN
WILSON; CHANCE WILSON; SHAWN
WILSON; TERRY SHANE WILSON;
ROBYN L. WINTERS; PENNIE
WOLFORD; MATTHEW SCOTT YOUNG;
and JENNIFER YOUNG;

Plaintiffs,

v.

BONNEVILLE POWER
ADMINISTRATION, an administrative
body of the DEPARTMENT OF ENERGY
of the UNITED STATES, EUGENE
WATER & ELECTRIC BOARD, an
Oregon registered electric utility and
LANE ELECTRIC COOPERATIVE, INC,
an Oregon registered electric utility,

Defendants.

INTRODUCTION

1.      This Complaint arises from the Holiday Farm Fire, which Defendants'
powerlines caused on September 7, 2020, in Lane County, Oregon.

2.      In the days leading up to September 7, 2020, the National Weather
Service ("NWS") issued numerous dire warnings about unusually dangerous
weather conditions expected to strike Oregon. The NWS predicted hot, dry winds
from the east that could exceed 60 miles per hour for the evening of September 7th.
It repeatedly warned that these conditions would create the perfect environment for
wildfires. It even issued the rare "extremely critical" designation, which is reserved
only for when forecasters are confident of extremely dangerous wildfire conditions.
In response to these warnings, many utilities in Oregon deenergized powerlines
when the winds started on September 7, 2020. Their decisions saved lives and
spared property.

3.      The defendants in this action, Bonneville Power Administration
("BPA"), Eugene Water & Electric Board ("EWEB"), and Lane Electric Cooperative,
Inc. ("LEC") (collectively "Defendants"), knew about the extreme threat of wildfires
on the evening of September 7.

4.      They also knew that under the weather conditions on that day
continuing to energize their powerlines, or reenergizing their powerlines too soon,
would create an extreme risk, if not a certainty, of wildfires.  Indeed, all of their
websites have acknowledged that deenergizing their powerlines reduces the risk of
fire. But unlike other utilities, BPA, EWEB, and LEC intentionally continued to

energize the powerlines they owned, operated, or controlled despite the extreme fire risk, so that they could continue providing electricity to the public.

5.    After BPA, EWEB, and LEC continued to energize powerlines they owned, operated, or controlled, and despite warnings, the predictable occurred. As forecasted, the strong, dry winds on the evening of September 7, 2020, predictably toppled trees, downed powerlines, and ignited surrounding vegetation in communities across Oregon, including in the Holiday Farm area.

6.    The resulting fire in the Holiday Farm area was devastating. Over 170,000 acres burned. Hundreds of homes, schools, and businesses were destroyed. People's priceless possessions were incinerated. Their beloved pets and other animals suffered horrific deaths. For some, everything they had spent a lifetime gathering was lost. The wedding ring from their grandmother ruined. Their child's first set of shoes blackened beyond recognition. Irreplaceable pictures left in ashes. Another inevitable consequence of the fire that Defendants' intentional conduct caused was that many people, including Plaintiffs, who were in the area that the fire impacted, suffered serious ongoing personal injuries as a result of wildfire smoke, including harm to the heart, lungs, and other vital organs, and increased risk of stroke, heart attacks and respiratory problems. And all because Defendants continued to energize powerlines they owned, operated, or controlled.

/ / /

/ / /

/ / /



*A firefighter risks his life to battle the Holiday Farm Fire. Photo taken from the KPIC, Channel 4 website.*

*A small statute is all that is recognizable from an area where a library once stood. Photo by Andy Nelson/The Register-Guard and published in The Bulletin.*



7.    Plaintiffs now sue Defendants to recover damages for some of the harm they suffered. They make the allegations in this complaint based on personal knowledge, information and belief, and/or the investigation and research of counsel.

PARTIES

## I.    Plaintiffs

8.    Plaintiffs are individuals, representatives, and legal entities. At all times relevant to this pleading, Plaintiffs were homeowners, renters, business owners, residents, and occupants of real property located in Lane County, and/or had a property interest located therein. The Holiday Farm Fire injured plaintiffs personally, interfered with their personal rights and interests in their property, and/or destroyed or damaged their property.

9.    Plaintiffs have elected to join their individual lawsuits in a single action under rules of permissive joinder as set forth in Rule 20(a)(1) of the Federal Rules of Civil Procedure. Plaintiffs do not seek class certification or relief on any collective basis. Instead, they seek damages and other remedies on an individual basis.

10.    The Holiday Farm Fire was ignited on September 7, 2020, and was extinguished no sooner than October 29, 2020.

11.    The Plaintiffs listed on Exhibit A (hereafter the "FTCA Plaintiffs"), have complied with the two-year notice requirement of the Federal Tort Claims Act, 28 U.S.C. § 2401(b). They gave BPA formal and actual notice of this claim on September 1, 2022, by sending BPA via email a completed SF-95 claim form, an attachment to the form containing additional information, a declaration stating that Singleton Schreiber, LLP, represents them in conjunction with this claim and is authorized to submit the claim on their behalf, and copies of the then most recent complaints filed on their behalf in Lane County, Oregon, against EWEB and LEC.

12.    The Plaintiffs listed on Exhibits B and C (hereafter the "OTCA Plaintiffs") have complied with ORS 30.725's 180-day notice requirement for actions against public entities, as amended by Executive Order 20-03, House Bill 4212, and Executive Order 21-15 as follows:

  a.    Plaintiffs listed on the attached Exhibit B gave EWEB formal and actual notice of this claim on June 2, 2021, and August 17, 2021, by

sending EWEB letters via certified and regular mail, listing their names.

b.    Plaintiffs listed on the attached Exhibit C gave EWEB formal and actual notice of this claim on September 24, 2021, and September 28, 2021, by sending EWEB's counsel letters via U.S. mail and e-mail, listing their names.

## II.    Defendants

13.    BPA is an administration within the Department of Energy of the United States, based in the Pacific Northwest with its Administrator and office headquarters located in Portland, Oregon, as established pursuant to the Bonneville Project Act of 1937, 16 U.S.C. § 832(a).  It owns and operates powerlines and other electric equipment and infrastructure ("electric utility infrastructure") in Oregon to transmit, supply and provide electricity to public and private consumers.

14.    EWEB is an Oregon Corporation doing business as a public utility in Oregon. EWEB's primary place of business is at 500 East Fourth Avenue, Eugene, Oregon 97401. It conducts regular, sustained business in Oregon. It owns and operates an electric utility infrastructure in Oregon to transmit, supply, and provide electricity to public and private consumers. EWEB is a public entity.

15.    LEC is an Oregon Corporation doing business as a public utility in Oregon. LEC's primary place of business is at 787 Bailey Hill Road, Eugene, Oregon, 97402. It conducts regular, sustained business in Oregon and Lane County. It owns and operates an electric utility infrastructure in Oregon to

transmit, supply, and provide electricity to public and private consumers.

JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court with respect to claims against BPA pursuant to 28 U.S.C. §§ 1331 and 1346(b) because the United States is a defendant, and this action arises under the laws of the United States.

17.     Jurisdiction is proper in this Court with respect to claims against EWEB and LEC under 28 U.S.C. § 1367, and because the claims against EWEB and LEC are so related to the claims against BPA that they form part of the same case or controversy.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to the claims occurred within this judicial district, and all Defendants own and operate electrical utility infrastructures in this judicial district.

ALLEGATIONS

I.     **Defendants have a duty to safely maintain and operate their electric utility infrastructures.**

19.     Defendants supply electricity in the Holiday Farm area. They own, operate, maintain, and repair electric utility infrastructures that transmit electricity to utility customers and to residents, businesses, schools, and industries in Oregon, including in and around the ignition points of the Holiday Farm Fire.

20.     Operating high-voltage electric equipment as part of an electric utility infrastructure carries inherent dangers. The inherent and heightened danger associated with the transmission and distribution of electricity through overhead

COMPLAINT - Page 12

powerlines in vegetated areas requires Defendants to exercise care to protect the public and the communities in which their electric utility infrastructures operate. Moreover, Defendants have a level of expertise about the operation of electric utility infrastructure far beyond that of a layperson.

21.    Oregon lawmakers recognize that Defendants' electric utility infrastructures pose real and significant fire threats. As Governor Kate Brown's Wildfire Council stated in its Recommendations on Utility Preparedness: "As the frequency, intensity and duration of wildfires has increased in the West, there is a need to have electrical companies take measures to reduce the risk of these events. For example, powerline fires are on average ten (10) times larger than fires from other causes."

22.    Defendants have a duty to adequately operate, monitor, maintain, and repair their electric utility infrastructures to ensure that they do not cause fires. This duty includes not continuing to energize their powerlines during periods of critical fire risk to prevent fires and to allow first responders to safely access ignited areas to put out fires. Defendants' duty also includes not allowing anything around their infrastructure and equipment (including land, vegetation, objects, and structures) to exist, develop, or grow, such that it is likely to come into contact with their electric utility infrastructures in such a way as to cause a fire or otherwise endanger the public.

/ / /

/ / /

**II.    Defendants knew about the extreme fire risk on Labor Day 2020.**

23.    Due in part to extreme drought conditions as designated in the U.S. Drought Monitor on both sides of the Cascade Mountains through 2020, fire potential was well above normal levels at the beginning of September 2020.

24.    Starting on Wednesday, September 2, 2020, the NWS began issuing warnings about dangerous weather conditions for fires in Oregon. The NWS noted that beginning on Monday, September 7, 2020—Labor Day—there would be gusty offshore winds leading to "fire weather concerns[.]"

25.    On Friday, September 4, 2020, the NWS continued to issue warnings about the weather that would begin the following Monday. The NWS predicted winds of a magnitude that one would expect to see "once every 30 years." The NWS warned that, as "a result . . . fire weather concerns abound." The NWS recognized that this was "an unusual amount of lead time for a watch[.]" But because of "the high level of confidence in a strong east wind event," the NWS felt it was "prudent to give fire officials as much time to prepare as possible." The NWS urged "extreme caution[.]" In issuing this warning, the NWS specifically identified geographic areas of concern, including an area that covered the Holiday Farm area. It also again identified "Monday evening" as when the extreme winds would begin and create the "potential to see rapid fires spread[.]"

26.    On Saturday, September 5, 2020, the NWS issued a "Red Flag Warning" that would begin at noon on Monday (Labor Day) and end at 10:00 p.m., on Tuesday and predicted extreme winds between 35 and 50 miles per hour. The

NWS issues a "Red Flag warning" when "warm temperatures, very low humidities, and stronger winds are expected to combine to produce an increased risk of fire danger."

27.    On Sunday, September 6, 2020, the NWS reiterated that there were "many concerns" about the winds beginning Monday evening. Among those concerns was "the extreme fire danger[.]" And by Sunday evening, the NWS identified 8:00 p.m., Monday through 1:00 p.m., Tuesday as the most concerning period.

28.    The NWS continued to issue warnings in the days and hours leading up to the evening of Monday, September 7. On the morning of September 7, 2020, the NWS informed the public that they were on "track for an extremely dangerous period of fire weather[.]" Winds were expected to reach speeds of 60 to 80 miles per hour. The conditions put much of Oregon—including the Holiday Farm area—in the "Extremely Critical" category. This rare category is reserved for situations in which forecasters are confident about extremely dangerous wildfire conditions on a given day. Before September 7, 2020, the NWS had placed Oregon in this category only twice before, in the summer of 2000. Thus, by the morning of September 7, Defendants knew that there was an extreme fire risk throughout Oregon, including in the Holiday Farm area.

29.    On the evening of September 7, 2020, at about 8:00 p.m., Governor Kate Brown's chief of staff organized a call that included several electric utilities, including BPA. During that call, Doug Grafe, Chief of Fire Protection of the Oregon

Department of Forestry ("ODF"), advised the utilities to deenergize their lines to prevent ignition of additional wildfires.

### III.    Defendants knew what to do to prevent wildfires during extreme weather conditions.

30.    Well before the ODF advised the utilities to cease energizing their powerlines on Labor Day 2020, Defendants knew that ceasing to energize powerlines was an effective way to prevent wildfires during periods of elevated fire danger, including during high wind events. As early as 2013, electric utilities on the West Coast had adopted plans requiring intentional temporary outages to prevent fires. By September 7, 2020, Good Utility Practice required utilities to have a plan for deenergizing powerlines under conditions of extreme fire danger. Indeed, many utilities in Oregon deenergized their powerlines in anticipation of the high winds that blew through on Labor Day 2020.

31.    Despite this, it wasn't until 2020 that BPA adopted a Mitigation Plan stating that deenergizing powerlines is a way to prevent wildfires: "During fire season, which typically ranges from sometime in May to late October, there may be extreme conditions or weather triggers that require BPA to deenergize certain assets to reduce the risk of a potential uncontrolled ignition. These extreme weather triggers are designed using best practices on imminent fire danger and geospatial analysis of wind and humidity variables. BPA has decided that these extreme weather triggers are wind in excess of 60 mph combined with NWS Red Flag Warning (RFW) and/or relative humidity < 20%. These variables have been

calibrated to BPA's robust design standards which allow for heavy wind and loading conditions."

32.     Although BPA's Wildfire Mitigation Plan was not in effect at the time of the Holiday Farm Fire, before the fire occurred it had become "good utility practice," under industry-based practices and methods generally utilized in the electric utility industry, to deenergize powerlines under the weather conditions described in the plan. Those conditions existed on the evening of September 7, 2020.

33.     EWEB's website makes a similar statement regarding deenergizing powerlines. On April 8, 2021, the "Wildfire and Safety Prevention" page of EWEB's website stated: "When there is a high risk for a wildfire, we may temporarily shut off power to certain neighborhoods to prevent our electric utility infrastructure from becoming the source of an ignition" In making the decision whether to deenergize its powerlines, EWEB stated that it looked at whether there is a "Red Flag Warning" by the NWS; whether the forecast called for "[s]ustained winds over 20 mph and gusts above 30 mph"; whether there were humidity levels under 20 percent; and whether there was "[d]ry [m]aterial on the [g]round." As EWEB knew, *all* these factors mandated that it deenergize its powerlines on the evening of September 7, 2020.

34.     LEC's website states: "We do not take power shutoffs lightly and do so when there's fire danger (temperature, relative humidity, wind) and physical threats to the safety of our communities." As LEC knew, *all* these factors compelled

COMPLAINT - Page 17

it to deenergize its powerlines on the evening of September 7, 2020.

**IV.    Defendants' actions and inactions predictably and inevitably led to a fire igniting during the evening of September 7, 2020.**

35.    Because of the extreme fire danger, several owners and operators of electric utility infrastructure in Oregon other than BPA, EWEB, and LEC deenergized their powerlines on Labor Day weekend of 2020 well before the evening of September 7, 2020. These other owners and operators made public announcements long before the shutoffs, including in major media outlets, alerting everyone that because of the elevated risk of wildfire, electricity would be temporarily shut off.

36.    There were two points of ignition of the Holiday Farm Fire. The first ignition occurred at 5:25 p.m. on September 7, 2020, when a tree that BPA should have removed crashed onto its powerline near milepost 42 of Highway 126, causing a fault (the "First Ignition").

37.    Immediately after the fault caused by the tree falling on BPA's line, circuits opened automatically, deenergizing BPA's, EWEB's, and LEC's powerlines running from the Holden Creek Substation to the Carmen Smith Powerhouse (the "Cougar–Holden Creek Line"). Without checking to determine the cause of the fault, at 5:25:48 p.m., BPA reenergized the segment of the Cougar–Holden Creek Line between the Holden Creek Substation and the Blue River Tap. In so doing, it also reenergized LEC's powerline, to which BPA supplied power from the Cougar–Holden Creek Line.

38.     After the First Ignition, EWEB did not reenergize the segment of the Cougar–Holden Creek Line that ran from the Blue River Tap to the Carmen Smith Powerhouse.

39.     The second ignition occurred at about 8:00 p.m. on September 7, 2020, near milepost 47 of Highway 126, when a tree fell on EWEB's deenergized powerline on the south side of Highway 126.  The fallen tree caused EWEB's line to sag and strike LEC's energized line where it crossed over LEC's line on the north side of Highway 126. When EWEB's line struck LEC's line, EWEB's deenergized powerline became reenergized, igniting the fallen tree and other vegetation (the "Second Ignition").

40.     Despite the NWS's warnings and all the other information Defendants knew about the elevated risk of fire on Labor Day, and knowledge that other utilities had deenergized their powerlines, all Defendants intentionally energized their lines until the time of the First Ignition. If Defendants had deenergized their lines prior to that time, the Holiday Farm Fire would not have occurred.

41.     Following the First Ignition, now knowing that under the extreme conditions there was a near certainty that their powerlines would start a wildfire, BPA and LEC intentionally reenergized their powerlines, thereby, along with EWEB's failure to properly manage vegetation, causing the Second Ignition.

42.     It was egregious for Defendants to continue to energize powerlines on September 7th, even before the First Ignition, because Defendants knew that their vegetation management programs on land surrounding their powerlines were

inadequate. Indeed, Defendants' vegetation management policies and practices made it substantially certain that vegetation would fall against Defendants' powerlines in high winds. Similarly, Defendants' maintenance standards for line tension ensured that arcing and sparks would occur when high winds caused their powerlines to come into contact with each other.

43.    The natural, ordinary, and predictable consequence of Defendants' intentional conduct—including continuing to energize powerlines that they owned, operated, or controlled when there was extreme wildfire danger--led to their powerlines falling and, shortly thereafter, starting the Holiday Farm Fire, which rapidly and predictably spread to Plaintiffs' properties.

44.    The Holiday Farm Fire eventually destroyed over 170,000 acres. It killed at least one person, injured countless others, and caused millions of dollars in property damage.

**V.    Defendants' actions predictably led to Plaintiffs' harm.**

45.    Defendants knew that any fire started on September 7, 2020, would be almost impossible to contain due to conditions that were known or predicted, including strong, hot, dry winds; the wind direction and speed (including gusts reaching up to 50 miles per hour); the area's existing topography, geography, and ecological and drought conditions; high fuel loads; high energy release conditions; limited escape routes; limited access for firefighters and emergency personnel; and limited firefighting resources available due to fires elsewhere. These same conditions made it foreseeable that the wildfire that Defendants' powerlines started

would spread to Plaintiffs' properties and cause their property loss, given the close proximity of Plaintiffs' properties to the Holiday Farm fire ignition points and presence in the fire's burn area.

46.    The inevitable consequence of the fire that Defendants' intentional decisions caused was that flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on Plaintiffs' real and personal property, causing incredibly hazardous and unhealthy conditions, and interfering with Plaintiffs' right to enjoy their properties. This interference is ongoing, as Plaintiffs face an ongoing risk of harm to themselves and their property from rockfall, flooding, debris flows, diminished drinking water quality, decreased soil productivity, and increased noxious weed spread – all caused by the Holiday Farm Fire.

47.    Another inevitable consequence of the fire that Defendants' intentional conduct caused was that many people, including Plaintiffs, who were in the area that the fire impacted suffered serious, ongoing personal injuries because of wildfire smoke, including harm to the heart, lungs, and other vital organs, and increased risk of stroke, heart attacks and respiratory problems.

48.    The Holiday Farm Fire caused Plaintiffs to suffer substantial harm to their persons, interests, and property including, but not limited to, interference with their personal rights and interests in their use and quiet enjoyment of their real and personal properties; interference with their normal and usual activities; personal injuries including irritation of the eyes and respiratory tract, coughing,

phlegm, wheezing, and difficulty breathing; fear for their lives and personal safety,

mental suffering, emotional distress, stress, anxiety, annoyance and inconvenience;

medical bills; increased risks of emergency room visits, hospital admissions, and

premature death; horrific death of beloved pets and other animals; damage to and

destruction of real property; damage to and loss of structures, personal property,

and cherished possessions; out-of-pocket expenses directly incurred as a result of

the fire; additional living expenses; evacuation expenses; uncompensated time

engaged in recovery efforts; lost wages; loss of earning capacity; and loss of business

income and goodwill.

## FIRST CLAIM FOR RELIEF

### Negligence

### (Asserted by the FTCA Plaintiffs Against BPA Only)

49.    Paragraphs 1-48 are incorporated into this claim for relief.

50.    The provision of electrical power involves a peculiar and inherent risk

of wildfire and requires the exercise of care and precaution commensurate with and

proportionate to that increased risk, so as to make the transport of electricity

through an electric utility infrastructure safe under all circumstances and

exigencies.

51.    BPA has special knowledge and expertise far beyond that of a

layperson about the safe operation, maintenance, and repair of electric utility

infrastructures including vegetation management efforts.

52.    Prior to and on September 7, 2020, BPA had a duty to apply a level of

care commensurate with, and proportionate to, the inherent dangers in operating,

maintaining, and repairing an electric utility infrastructure. This duty also required BPA to maintain a vegetation management program(s) for the control of vegetation surrounding BPA's exposed power lines and to comply with its own Transmission Vegetation Management Program.

53.    BPA's duty of care also required it to adhere to Good Utility Practice as defined in its Open Access Transmission Tariff, as follows:

> Any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost *consistent with good business practices, reliability, safety and expedition.* Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods,  or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4).

54.    BPA's duty of care also required that it to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions, and to take special precautions to protect nearby properties from wildfires caused by BPA's electric utility infrastructure.

55.    BPA breached its duties by, among other things:

a.    Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

b.    Maintaining and inspecting vegetation within proximity to its energized powerlines in a manner that did not adequately mitigate the

foreseeable risk of fire, as required under its Transmission Vegetation

Management Program;

c.      Conducting inspections that were not sufficiently prompt, proper, or

frequent to protect its electric utility infrastructure;

d.      Reenergizing powerlines it owned, operated or controlled, including the

Cougar-Holden Creek Line, after a fault at approximately 5:25 p.m., on

September 7, 2020, when the First Ignition occurred;

e.      Reenergizing its electric utility infrastructure after vegetation fell on

its powerlines;

f.      Delaying inspection of its powerlines after vegetation fell on them;

g.      Providing inadequate training and supervision of employees and

agents responsible for maintenance and inspection of its electric utility

infrastructure; and/or

h.      Choosing to delay implementation and compliance with regulations

and reasonably prudent practices to avoid fire ignition.

56.      In engaging in the conduct alleged in the preceding paragraphs, BPA
employees violated policies that they were required to follow, failed to adhere to
objective standards of care, and negligently exercised their professional and
scientific judgment.

57.      BPA knew of the extreme fire danger immediately before September 7,
2020, and it breached its duty of reasonable care to the FTCA Plaintiffs by acting
unreasonably in light of that knowledge. The Holiday Farm Fire, including the First

Ignition and the Second Ignition, was a direct and legal result of BPA's breach of its duties of reasonable care to the FTCA Plaintiffs.

58.    BPA acted intentionally with indifference to the probable and foreseeable consequences of its acts and omissions. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

59.    The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## SECOND CLAIM FOR RELIEF

### Negligence *Per Se*

### (Asserted by the FTCA Plaintiffs Against BPA Only)

60.    Paragraphs 1-59 are incorporated into this claim for relief.

61.    BPA had a special relationship with the FTCA Plaintiffs that created a special duty to the FCTA Plaintiffs. This special relationship arose out of, among other things, Oregon statutes and regulations regulating utilities. Oregon law required BPA to extinguish any fire it accidentally started in any forestland, or any place from which fire may be transmitted to forestland, or to use every effort to do so; and to not carelessly or through neglect permit a fire caused on or near forestland to spread to or through forestland. ORS 477.720.

62.    Oregon law also required BPA, among other things, to:

COMPLAINT - Page 25

a.  "[C]onstruct, operate, and maintain electrical supply . . . lines in compliance with the standards prescribed by the 2017 Edition of the National Electricity Safety Code approved April 26, 2016, by the American National Standards Institutes." OAR 860-024-0010.

b.  "Construct, operate, and maintain" facilities in compliance with safety rules promulgated by the PUC. OAR 860-024-0011(1)(a); and

c.  "Perform routine safety patrols of overhead electric supply lines and accessible facilities for hazards to the public" at least every two years. OAR 860-024-0011(2).

63.  Additional regulations applicable to BPA included, without limitation, the requirement that BPA "trim or remove vegetation to maintain clearances from electric supply conductors" to include maintaining "[u]nder reasonably anticipated operational conditions" at least ten feet clearance of vegetation for conductors energized above 200,000 volts; at least 7.5 feet clearance of vegetation for conductors energized at between 50,001 and 200,000 volts; and at least 5 feet clearance of vegetation for conductors energized at between 600 and 50,000 volts (or 3 feet if the vegetation is not readily climbable). OAR 860-024-0016(5).

64.  Through its conduct described herein, BPA violated the statutes and regulations set forth above.

65.  The statutes and regulations that BPA violated are intended to prevent the exact type of harm that Plaintiffs suffered.  BPA's noncompliance with the statutes and regulations specified above directly, legally, and proximately

resulted in the Holiday Farm Fire, and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

66.    The FTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## THIRD CLAIM FOR RELIEF

### Trespass

### (Asserted by the FTCA Plaintiffs Against BPA Only)

67.    Paragraphs 1-66 are incorporated into this claim for relief.

68.    On September 7, 2020, the FTCA Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. The FTCA Plaintiffs' possessory interests in their properties was exclusive.

69.    BPA negligently, recklessly, and/or intentionally took action that caused the First and Second Ignitions, resulting in a fire that spread out of control, which harmed the FTCA Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on the FTCA Plaintiffs' real and personal property.

70.    BPA knew that a trespass would result from its actions. BPA's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions.

71.    The FTCA Plaintiffs did not grant permission for any fire to enter their

properties.

72.    This trespass was a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

73.    The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## FOURTH CLAIM FOR RELIEF

### Nuisance

### (Asserted by FTCA Plaintiffs Against BPA Only)

74.    Paragraphs 1-73 are incorporated into this claim for relief.

75.    On September 7, 2020, the FTCA Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. The FTCA Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

76.    BPA owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire, including the First and Second Ignitions that rapidly spread out of control.

77.    BPA's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure, as described above, created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with

the comfortable enjoyment of life and property; and (d) unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways.

78.    These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with the FTCA Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

79.    These conditions affected a substantial number of people at the same time.

80.    At no time did the FTCA Plaintiffs consent to BPA's actions in creating these conditions.

81.    An ordinary person would be reasonably annoyed and disturbed by BPA's actions that created these conditions.

82.    BPA's actions in creating these conditions were a substantial factor in causing the FTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

83.    BPA's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with the FTCA Plaintiffs' use and enjoyment of their real and personal property.

84.    The harms caused by BPA were unique to each FCTA Plaintiff and different from damages suffered by other FTCA Plaintiffs and from the general public.

85.    Whatever benefit to BPA its behavior may have provided was outweighed by the harm its operations imposed on the FTCA Plaintiffs.

COMPLAINT - Page 29

86.    The FTCA Plaintiffs each seek damages on an individual basis in amounts as shall be provide at trial. The FTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## FIFTH CLAIM FOR RELIEF

### Negligence

### (Asserted by All Plaintiffs Against LEC Only)

87.    Paragraphs 1-48 are incorporated into this claim for relief.

88.    Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

89.    LEC has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructures including vegetation management efforts.

90.    Prior to and on September 7, 2020, LEC had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required LEC to maintain appropriate vegetation management programs for the control of vegetation surrounding LEC's exposed power lines. This duty also required LEC to consider the changing conditions of its electric utility

infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required LEC to take special precautions to protect nearby properties from wildfires caused by LEC's electric utility infrastructure.

91.    LEC breached its duties by, among other things:

a.    Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

b.    Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

c.    Continuing to energize its powerlines despite the extreme fire risk on the evening of September 7, 2020;

e.    Continuing to energize its powerlines after a fault occurred on a BPA line at approximately 5:25 p.m. on September 7, 2020, without first determining the cause of the fault and evaluating the risk associated with continuing to energize its powerlines;

f.    Designing its electric utility infrastructure so that its powerlines crossed under EWEB's powerlines without adequate clearance between its and EWEB's powerlines.

g.    Taking inadequate precautions to assure that EWEB's powerlines did not sag and were sufficiently clear of vegetation to prevent the risk of contact with its powerlines;

h.    Delaying inspection of its powerlines after they came in contact with EWEB's powerlines;

i.    Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure; and/or

j.    Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

92.    LEC knew of the extreme fire danger that the conditions on and immediately before September 7, 2020, created, and it breached its duty of reasonable care to Plaintiffs by acting unreasonably in light of that knowledge. The Holiday Farm Fire, in particular the Second Ignition which rapidly spread out of control, was a direct and legal result of LEC's breach of its duties of reasonable care to Plaintiffs.

93.    LEC acted with indifference to the probable and foreseeable consequences of its acts. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

94.    Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

/ / /

## SIXTH CLAIM FOR RELIEF

### Trespass

### (Asserted by All Plaintiffs Against LEC Only)

95.    Paragraphs 1-48 and 87-94 are incorporated into this claim for relief.

96.    On September 7, 2020, Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. Plaintiffs' possessory interests in their properties was exclusive.

97.    LEC negligently, recklessly, and/or intentionally allowed fire to ignite and/or spread out of control, which harmed Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on Plaintiffs' real and personal property.

98.    LEC's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions.

99.    Plaintiffs did not grant permission for any fire to enter their properties.

100.    This trespass was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

101.    Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## SEVENTH CLAIM FOR RELIEF

### Nuisance

### (Asserted by All Plaintiffs Against LEC Only)

102. Paragraphs 1-48 and 87-101 are incorporated into this claim for relief.

103. On September 7, 2020, Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

104. LEC owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

105. LEC's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) obstructed the free passage or use, in the customary manner, of public streets and highways.

106. These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

107. These conditions affected a substantial number of people at the same time.

108. At no time did Plaintiffs consent to LEC's actions in creating these conditions.

109.    An ordinary person would be reasonably annoyed and disturbed by LEC's actions in creating these conditions.

110.    LEC realized or should have realized that the objectionable condition posed an unreasonable risk of fire that could spread and cause harm to Plaintiffs' persons, interests, and property.

111.    LEC could have fully eliminated the risk of fire, at little or no cost, by deenergizing its powerlines during extremely dangerous conditions, and its decision not to do so was negligent, reckless, and/or intentional.

112.    LEC's actions in creating these conditions were a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

113.    LEC's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their real and personal property.

114.    The harms caused by LEC were unique to each Plaintiff and different from damages suffered by other Plaintiffs and from the general public.

115.    Whatever benefit LEC realized by its behavior was outweighed by the harm its operations imposed on Plaintiffs.

116.    Plaintiffs each seek damages on an individual basis in amounts as shall be proven at trial. Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

COMPLAINT - Page 35

## EIGHTH CLAIM FOR RELIEF

### Negligence

### (Asserted by the OTCA Plaintiffs Against EWEB Only)

117.    Paragraphs 1-48 are incorporated into this claim for relief.

118.    Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through an electric utility infrastructure safe under all circumstances and exigencies.

119.    EWEB has special knowledge and expertise far beyond that of a layperson about the safe operation, maintenance, and repair of electric utility infrastructures including vegetation management efforts.

120.    Prior to and on September 7, 2020, EWEB had a duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in operating, maintaining, and repairing an electric utility infrastructure. This duty also required EWEB to maintain appropriate vegetation management programs for the control of vegetation surrounding EWEB's exposed power lines. This duty also required EWEB to consider the changing conditions of its electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required EWEB to take special precautions to protect nearby properties from wildfires caused by EWEB's electric utility infrastructure.

/ / /

121.    EWEB breached its duties by, among other things:

a.    Operating and maintaining its electric utility infrastructure in a manner that was inadequate to withstand the foreseeable risk of wildfires;

b.    Maintaining and inspecting vegetation within proximity of its energized powerlines in a manner that did not adequately mitigate the foreseeable risk of fire;

c.    Conducting inspections that were not sufficiently prompt, proper, or frequent to protect its electric utility infrastructure;

d.    Energizing its powerlines despite the extreme fire risk on the evening of September 7, 2020;

e.    Designing its electric utility infrastructure so that its powerlines crossed over LEC's powerlines without adequate clearance between its powerlines and LEC's powerlines;

f.    Designing or allowing its powerlines to have insufficient tension, resulting in the powerlines sagging and thereby creating a risk of contact with LEC's powerlines;

g.    Delaying inspection of its powerlines after they came in contact with EWEB's powerlines;

h.    Delaying notification to first responders that its and LEC's powerlines were deenergized and that it was safe to engage in fire suppression activities;

      i.      Providing inadequate training and supervision of employees and agents responsible for maintenance and inspection of its electric utility infrastructure; and/or

      j.      Choosing to delay implementation and compliance with regulations and reasonably prudent practices to avoid fire ignition.

122.    EWEB knew of the extreme fire danger that the conditions immediately before September 7, 2020, created, and it breached its duty of reasonable care to the OTCA Plaintiffs by acting unreasonably in light of that knowledge. As a result of EWEB's breaches of duty, a tree fell on its powerline, causing its line to contact LEC's line, creating an arc or otherwise energizing its line, and thereby causing the Second Ignition which spread rapidly out of control. Consequently, the Holiday Farm Fire was a direct and legal result of EWEB's breach of its duties of reasonable care to the OTCA Plaintiffs.

123.    EWEB acted with indifference to the probable and foreseeable consequences of its acts. Its negligence caused the Holiday Farm Fire and was a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

124.    The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

/ / /

## NINTH CLAIM FOR RELIEF

### Trespass

### (Asserted by the OTCA Plaintiffs Against EWEB Only)

125.    Paragraphs 1-48 and 117-124 are incorporated into this claim for relief.

126.    On September 7, 2020, the OTCA Plaintiffs were the owners, tenants, or lawful occupiers of real properties in the Holiday Farm area of Oregon. The OTCA Plaintiffs' possessory interests in their properties was exclusive.

127.    EWEB negligently, recklessly, and/or intentionally allowed fire to ignite and/or spread out of control, which damaged the OTCA Plaintiffs' persons, interests, and properties. Flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on the OTCA Plaintiffs' real and personal property.

128.    EWEB knew that a trespass would result from its actions. EWEB's actions in setting in motion the unauthorized entry and trespass were undertaken knowing that a trespass would result, and a trespass resulted from those actions and inactions.

129.    The OTCA Plaintiffs did not grant permission for any fire to enter their properties.

130.    This trespass was a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

131.    The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the

amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

## TENTH CLAIM FOR RELIEF

### Nuisance

### (Asserted by OTCA Plaintiffs Against EWEB Only)

132.    Paragraphs 1-48 and 117-131 are incorporated into this claim for relief.

133.    On September 7, 2020, the OTCA Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area to which the Holiday Farm Fire spread. The OTCA Plaintiffs had a possessory interest in real property that the Holiday Farm Fire damaged and destroyed, including the right to quiet use and enjoyment.

134.    EWEB owned, maintained, controlled, and/or operated the electric utility infrastructure that caused the Holiday Farm Fire.

135.    EWEB's negligent, reckless, and/or intentional actions with respect to its electric utility infrastructure, as described above, created conditions and/or permitted conditions to exist that (a) were harmful to health; (b) offended the senses; (c) obstructed the free use of property, so as to substantially interfere with the comfortable enjoyment of life and property; and (d) unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways.

136.    These conditions, including flames, smoke, embers, ash, odors, gases, and airborne particles, interfered with the OTCA Plaintiffs' right to quiet enjoyment of their properties in a way unique to each Plaintiff.

137.   These conditions affected a substantial number of people at the same time.

138.   At no time did the OTCA Plaintiffs consent to EWEB's actions that created these conditions.

139.   An ordinary person would be reasonably annoyed and disturbed by EWEB's actions in creating these conditions.

140.   EWEB's actions in creating these conditions were a substantial factor in causing the OTCA Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

141.   EWEB's negligence, recklessness, and/or intentional behavior substantially and unreasonably interfered with the OTCA Plaintiffs' use and enjoyment of their real and personal property.

142.   The harms caused by BPA were unique to each OTCA Plaintiff and different from damages suffered by other the OTCA Plaintiffs and from the general public.

143.   Whatever benefit EWEB realized by its behavior is outweighed by the harm its operations imposed on the OTCA Plaintiffs.

144.   The OTCA Plaintiffs each seek damages on an individual basis as shall be proven at trial. The OTCA Plaintiffs also seek damages equal to twice the amount of their property and economic damages to the extent allowed under ORS 477.089(2)(b).

/ / /

**PRAYER FOR RELIEF**

Plaintiffs seek:

      (a)     Damages on an individual basis in amounts as shall be proven at trial;

      (b)     Reasonable attorney's fees and costs to the extent permitted under ORCP 68B;

      (c)     Twice the amount of their economic and property damages, to the extent permitted under ORS 477.089(2)(b); and

      (d)     Any other relief as the Court shall deem proper, all according to proof.

**JURY TRIAL REQUEST**

Plaintiffs request a jury trial on all claims for relief for which a jury trial is available under the law.


Dated: January 30, 2024         Singleton Schreiber LLP

           By:

                 /s/  *Susan B. Dussault*
                 Gerald Singleton, OSB #210955
                 gsingleton@singletonschreiber.com
                 Susan B. Dussault, OSB #021125
                 sdussault@singletonschreiber.com
                 Singleton Schreiber LLP
                 Stephen J. Hill, OSB #240164
                 shill@singletonschreiber.com
                 591 Camino de la Reina, Suite 1025
                 San Diego, CA 92108
                 Tel.  (619) 771-3473

                 Attorneys for Plaintiffs